1                    **UNITED STATES DISTRICT COURT**

2                          **DISTRICT OF OREGON**

3                          **PORTLAND DIVISION**

4    TIM PHILLIPS,                          )
                                            )
5              Plaintiff,                    )      No. 03:13-cv-00603-HU
                                            )
6    vs.                                     )
                                            )
7    CAROLYN W. COLVIN,                      )      **FINDINGS & RECOMMENDATION**
     Commissioner of Social Security,        )
8                                            )
               Defendant.                    )
9

10          _____

11   Merrill Schneider
     Schneider Kerr & Gibney Law Offices
12   P.O. Box 14490
     Portland, OR 97293
13
             Attorney for Plaintiff
14

15   S. Amanda Marshall
     United States Attorney
16   Ronald K. Silver
     Assistant United States Attorney
17   1000 S.W. Third Avenue, Suite 600
     Portland, OR 97204-2904
18

19   David Morado
     Regional Chief Counsel, Region X, Seattle
20   Nancy A. Mishalanie
     Special Assistant United States Attorney
21   Office of the General Counsel
     Social Security Administration
22   701 Fifth Avenue, Suite #2900 M/S 901
     Seattle, WA  98104-7075
23
             Attorneys for Defendant
24

25

26

27

28

1 - FINDINGS & RECOMMENDATION

HUBEL, United States Magistrate Judge:

The plaintiff Tim Phillips seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the Commissioner's final decision denying his application for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*. Phillips argues the Administrative Law Judge ("ALJ") erred in failing to recognize Phillip's "severe mental impairments at step two"; "failing to account for social limitations put forth by the State agency medical expert in formulating [Phillips's] residual functional capacity between steps three and four"; and "accepting testimony from a vocational expert that conflicted with the *Dictionary of Occupational Titles* at step five." Dkt. #12, ECF p. 6; *see* Dkt. #17.

## I.  PROCEDURAL BACKGROUND

Phillips filed his current application[1] for SSI benefits on June 2, 2008, at age 44, claiming disability since December 7, 2002. (A.R. 12 [2]; 103-06) Phillips claims he is disabled due to

---

[1]Phillips has been attempting to establish entitlement to disability payments since he was 26 years old. The ALJ noted Phillips "has an extensive history of prior disability applications," including applications filed in October 1989, March 2004, March 2006, and March 2007. Each of those applications was denied. (A.R. 12)

[2]The administrative record ("A.R.") was filed electronically using the court's CM/ECF system. Dkt. #11 and attachments. Pages of the A.R. contain at least three separate page numbers: two located at the top of the page, consisting of the CM/ECF number (e.g., Dkt. #11-1, Page 111 of 124) and a Page ID#; and a page number located near the upper right of the page, representing the numbering inserted by the Agency. Some pages also contain a page number inserted by the office supplying the records. Citations herein to "A.R." refer to the agency numbering near the upper right (continued...)

2 - FINDINGS & RECOMMENDATION

1  memory loss; depression; and back, knee, and neck injuries from
2  multiple car accidents. (*See* A.R. 108, 115, 118; Dkt. #12, ECF
3  p. 2) He claims that although his symptoms began interfering with
4  his ability to work in 2002, "he continued to work with the
5  symptoms until 2005 when his pain became so severe that he could no
6  longer drive." Dkt. #12, ECF p. 2.

7       Phillips's application was denied initially and on recon-
8  sideration. (A.R. 41-44) Phillips requested a hearing, and a
9  hearing was held on October 28, 2011, before an ALJ. Phillips was
10 represented by an attorney at the hearing. Witnesses at the hear-
11 ing included Phillips, and a Vocational Expert ("VE") (A.R. 498-
12 538) On February 7, 2012, the ALJ issued his decision, denying
13 Phillips's application for benefits. (A.R. 17-24) Phillips
14 appealed the ALJ's decision, and on March 5, 2013, the Appeals
15 Council denied his request for review (A.R. 4-6), making the ALJ's
16 decision the final decision of the Commissioner. *See* 20 C.F.R.
17 §§ 404.981, 416.1481. Phillips filed a timely Complaint in this
18 court seeking judicial review of the Commissioner's final decision
19 denying his application for SSI benefits. Dkt. #1. The matter is
20 fully briefed, and the undersigned submits the following findings
21 and recommended disposition of the case pursuant to 28 U.S.C.
22 § 636(b)(1)(B).

23

24                    **II.  FACTUAL BACKGROUND**

25               **A.  Summary of the Medical Evidence**

26

27

28       [2](...continued)
   corner of each page.

3 - FINDINGS & RECOMMENDATION

In January 2008, Phillips saw a doctor at Oregon Health & Science University ("OHSU"), complaining of pain in his left knee. His knee had been hit directly by a car in May 2007, and he had not received any specific treatment since the accident.  He reported his knee locking, and notes indicate the knee actually locked during the exam.  X-rays revealed a large ganglion cyst protruding into the front of his left knee; a probable meniscus tear; and possible abnormally-shaped meniscus.  In addition, his ACL fibers appeared to be swollen.  Surgery was advised, and Phillips was referred to Dr. Dennis Crawford at OHSU Sports Orthopedics. Crawford was noted to be "an expert in Sports Medicine Surgery and Cartilage Restoration[.]"  (A.R. 231)

Phillips underwent ACL reconstruction surgery on April 1, 2008.  He had some pain after surgery when the cab driver taking him home shut Phillips's surgical leg in the door.  This caused Phillips difficulty bearing weight fully due to pain, but he was able to do his home exercises, and the pain improved.  He was seen for followup on May 9, 2008, and reported good progress.  He denied pain in his knee, but complained of pain in his back.  In August 2008, he reported walking about three miles per day, participating in a home exercise program, and doing well.  He had some pain on palpation near the incision site.

On September 15, 2008, Phillips saw a doctor for followup of chronic low back pain.  Phillips reported that his pain was no longer being controlled as well as in the past.  He was taking MS Contin (morphine sulfate) 30 mg. every eight hours, and Percocet 5-325 mg. every four to six hours as needed for pain.  He and the doctor had discussed a possible change to methadone previously, but

4 - FINDINGS & RECOMMENDATION

1 Phillips indicated methadone had made him quite ill in the past.
2 The doctor continued Phillips's MS Contin without change, and
3 increased his Percocet to 7.5-500 mg.  In addition, Phillips agreed
4 to a trial of Namenda for his memory loss.[3]  (A.R. 267-69)

5     In October 2008, Phillips saw a doctor complaining that his
6 left knee would "snap" backward when he was walking, with
7 increasing pain.  He had poor quadriceps strength and limited knee
8 mobility.  An MRI revealed a partial ACL tear with loose body in
9 the knee.  Phillips was scheduled for arthroscopic surgery to
10 remove the loose body, and also to remove painful hardware that
11 remained from his April knee surgery.  Prior to the debridement and
12 hardware removal, Phillips participated in physical therapy to
13 learn post-op exercises, learn to use crutches properly, and
14 receive instruction in post-op precautions.  Notes indicate
15 Phillips had some memory problems that might affect his ability to
16 learn exercises and adhere to post-op precautions.[4]

17     Phillips saw a Physician's Assistant on November 10, 2008, for
18 followup after his surgery.  He was "progressing well, [and]
19 participating in a home exercise program." (A.R. 186)  His sutures
20 were removed, and physical therapy was ordered.  He was taking
21 Vicodin for pain management.  (A.R. 187)

22     Phillips saw a doctor on November 11, 2008, for a possible
23 broken finger after falling in the shower.  The finger was swollen

24 

---

25    [3]"Namenda (memantine hydrochloride) is indicated for the
treatment of moderate to severe dementia of the Alzheimer's type."
26 http://www.rxlist.com/namenda-drug/indications-dosage.htm (visited
6/16/14).

27 

28    [4]The preceding summary of Phillips's injury and subsequent
knee surgeries was taken from treatment notes at A.R. 185-251.

5 - FINDINGS & RECOMMENDATION

and painful, and its range of motion was restricted.   An x-ray showed no fracture, and only mild soft tissue swelling.   The doctor prescribed Naproxen for seven to ten days, and applied a "buddy tape and splint" to the finger.   (A.R. 265, 270)   At the same visit, the doctor inquired about Phillips's progress from his knee surgery.   Phillips stated his knee pain was much improved.   He still had slight pain while climbing stairs, but otherwise he was doing quite well with therapy.   (A.R. 264)   Phillips saw a physician's Assistant ("PA") on December 9, 2008, for followup of his knee.   Phillips reported attending physical therapy and doing home exercises, and he continued to progress well.   (A.R. 185)

Phillips saw a doctor on April 17, 2009, for complaints of right shoulder pain and neck pain, increasing over the previous one to two months.   He also complained of increasing depression and anxiety.   Notes indicate Phillips's home life was quite stressful. His wife was disabled from schizophrenia and fibromyalgia.   Children ages 10 and 11 were living with the wife's father, who was an active alcoholic who had been hospitalized recently for a GI bleed. Phillips stated he was trying to get his father-in-law into inpatient treatment for alcoholism.   (A.R. 256)   The doctor started Phillips on Zanaflex for muscle spasms, as an adjunct to Phillips's chronic pain regimen.   He increased Phillips's Zoloft dosage from 100 mg. to 150 mg. daily.   (A.R. 257)   In addition to the Zanaflex and Zoloft, records indicate Phillips's current medications included Percocet 7.5-500 mg. (oxycodone-acetaminophen), one tablet every four to six hours as needed for pain; MS Contin 30 mg. (morphine sulfate), one every eight hours for pain; Hydroxyzine HCL 25 mg., one to two tablets "as needed [for] severe anxiety";

6 - FINDINGS & RECOMMENDATION

Atenolol 25 mg., "one tablet daily for blood pressure and tremor"; Namenda 10 mg. tabs, one daily, for his memory problems; and Colace and Miralax for chronic constipation. (A.R. 256)

On August 28, 2009, Phillips saw a doctor for complaints of right posterior chest wall pain that Phillips believed was the result of his accidentally running into a dresser the night before. Notes indicate Phillips previously had had an L4-5 fusion with bone graft, and he had diagnoses of degenerative disc disease of the thoracic spine at T4-8, and a herniated lumbar disc at L5-S1 with foraminal stenosis. He also had diagnoses of, among other things, depression; continuous opioid dependence; chronic insomnia; memory loss; tremor. (A.R. 252-53) X-rays revealed no rib fracture or pneumothorax. Phillips was directed to "only continue his chronic pain regimen at this time." (A.R. 254) Records indicate Phillips's current medications had not changed since April 2009, except that he now was taking Flexeril as a muscle relaxant instead of Zanaflex. (See A.R. 254)

Phillips saw a new doctor to establish care on September 15, 2009. He brought prescription bottles with him indicating his current medications included Zoloft 150 mg. daily; Vistaril 1-2 caps as needed for insomnia; Flexeril 10 mg., 1 tablet at bedtime; MS Contin 30 mg., 1 tablet three times daily; and "hydrocodone 7.5/500mg. 1 tab [every] 4-6 hours, #112 per month." (A.R. 319) Phillips signed a pain contract, and his medications were refilled. (A.R. 319-20) However, it appears the "hydrocodone" was noted incorrectly on Phillips's chart; he actually had been taking Percocet. He had experienced itching from hydrocodone in the past, and the same reaction occurred when he took one tablet from this

7 - FINDINGS & RECOMMENDATION

1 new prescription.  He contacted the doctor (who acknowledged the
2 incorrect notation), and he was placed back on Percocet 7.5-
3 500 mg., one tablet four times daily.  (A.R. 318)

4     Phillips's pain medications were continued without change on
5 November 13, and December 11 and 29, 2009, and January 5, 2010.
6 (A.R. 314-17)  Phillips expressed a desire to stop smoking, and the
7 doctor prescribed Chantix.  (A.R. 315)  By January 2010, Phillips's
8 complaint that Percocet was causing him constipation had resolved
9 with a prescription for Lactulose.  (A.R. 314)  Phillips saw a
10 doctor for medication management on January 29, 2010.  He rated his
11 pain at "7 to 8 out of 10."  (A.R. 313)  Phillips complained of new
12 pain in his right shoulder.  His pain medications were continued
13 without change, and he was referred to an orthopedist for evalu-
14 ation of the right shoulder pain.  (*Id.*)  X-rays of his right
15 shoulder on February 24, 2010, showed no acute osseous change or
16 dislocation.  Notes indicate if Phillips continued to experience
17 "pain or significant immobility, further evaluation of the right
18 shoulder by MRI is recommended."  (A.R. 278)

19     Phillips saw a doctor for medication management on March 1,
20 2010, rating his pain at 8/10.  His medications were continued
21 without change.  (A.R. 312)

22     On March 22, 2010, Phillips underwent a comprehensive psycho-
23 diagnostic evaluation by medical and clinical psychologist Donna C.
24 Wicher, Ph.D., P.C.  (A.R. 279-83)  The stated purpose of the
25 evaluation was to determine whether Phillips had "any mental,
26 cognitive, or emotional difficulties which would interfere with his
27 ability to sustain full-time, gainful employment."  (A.R. 279)  In
28

8 - FINDINGS & RECOMMENDATION

addition to performing a clinical interview with Phillips, Dr. Wicher also reviewed Phillips's medical records. (*See id.*)

Phillips reported having problems with anxiety and depression throughout his life, with only limited treatment. He began experiencing memory problems in his late teens. He stated he has panic attacks when he is around a lot of people. These attacks are accompanied by shortness of breath, hot flashes, tremors, excessive perspiration, and dizziness. The attacks last until he gets away from the situation. At the time of the evaluation, Phillips was complaining of "depressed mood, impaired memory and concentration, fatigue, stress, nervousness, panic attacks, periodic suicidal ideation with no history of attempts, and insomnia." (*Id.*) A recent increase in feelings of hopelessness was improving somewhat. (*Id.*) Physically, Phillips indicated he suffered from "pain in his neck, mid-back, low back, right shoulder, left knee, and hands." (A.R. 280) He also stated he has arthritis and hypertension. (*Id.*)

Phillips stated he drank and partied a lot as a teenager. He was in special education classes throughout school, and quit school in the ninth grade. He later tried to get a GED, but had been unsuccessful so far. He last worked full time in 2001. His work history includes dishwasher and cook at a restaurant for five or six years, until the restaurant closed; about a year as a clerk at a 7-11 store; and a number of shorter-term jobs, some of which he could not remember. These included roofing in his mid- to late-twenties, a job he quit "to avoid having his wages garnished"; gas station attendant; van driver for an auto auction for two years, "until he suffered an on-the-job injury"; five years with a

9 - FINDINGS & RECOMMENDATION

1  temporary service; and, most recently, driving a cab for three

2  years, which he quit "when he began having increasing problems with

3  memory." (A.R. 280)

4      Among other findings, Dr Wicher noted the following regarding

5  Phillips's mental status evaluation:

> Mr. Phillips was prompt for his appointment.
> He was pleasant and cooperative throughout the
> evaluation.  He was neatly groomed and casual-
> ly, but appropriately[,] attired.  He was
> oriented to person and place but stated that
> the date was March 18, 2009.  No gross defects
> in memory or concentration were noted, but
> mental status testing raised some questions
> about his abilities in these areas.  He was
> able to perform only three digits forward, but
> could perform four digits backward, suggesting
> that he could most likely perform more than
> four digits forward, given that most individu-
> als can perform more digits forward than
> backward.  In addition, he produced a Reliable
> Digit Span of only five, raising questions
> about whether he was putting forth consistent
> effort during mental status testing.  He was
> able to perform only relatively simple mathe-
> matical calculations, as measured by selected
> items taken from the Arithmetic subtest of the
> WAIS-III.  He demonstrated modest levels of
> common sense judgment, abstraction and gener-
> alization ability, and fund of general infor-
> mation, as measured by selected items taken
> from the Comprehension, Similarities, and
> Information subtests of the WAIS-III.  His
> proverb interpretation was somewhat limited,
> but adequate.  He was able to name the current
> and two most recent past presidents of the
> United States in correct reverse sequence.
> His thought processes appeared to be well
> intact and there were no indications of
> hallucinations or delusions.  His affect was
> appropriate and he displayed normal facial
> animation.  His mood was generally euthymic.
> His judgment appeared to be intact and he did
> not appear to be at current risk of harm to
> himself or others, although he described a
> history of poor judgment in the past involving
> substance abuse.  He spoke with normal rhythm,
> rate, prosody, and volume.  His speech pat-
> terns were unremarkable and were consistent
> with his educational and cultural background.

10 - FINDINGS & RECOMMENDATION

(A.R. 281)

Regarding his daily activities, Phillips reported:

> He typically arises at 2:00 in the afternoon,
> when his wife awakens him. He is unable to
> get to sleep until 4:00 or 5:00 in the morn-
> ing. He bathes on a daily basis. He spends
> much of the day watching television while
> lying on his bed or playing with his computer,
> sending and receiving e-mail, and going on-
> line to look up information. He plays games
> on his play station. He does not socialize,
> aside from contact with immediate family. His
> wife does most of the housekeeping chores. He
> noted that she has a care giver who helps with
> the cleaning tasks. He and his wife go gro-
> cery shopping on a monthly basis for major
> purchases and more often for perishable items.
> He does most of the cooking. For breakfast,
> he may prepare dishes such as bacon and eggs.
> He usually skips lunch, but can prepare dishes
> such as chicken or hamburgers along with side
> dishes for dinner. He is able to take public
> transportation or drive when he needs to go
> somewhere. He is his wife's payee and handles
> the bills. He is able to use the telephone
> and mail items independently.

(A.R. 282)

Dr. Wicher diagnosed Phillips with Dysthymic Disorder; Panic Disorder Without Agoraphobia; Polysubstance Abuse, currently dependent on opioids; Chronic Pain; and Hypertension. (*Id.*) She indicated it would be appropriate for Phillips to continue to take medication and receive treatment for depression and anxiety. She also noted Phillips's medical records indicate he is dependent on opioids, and she suggested "consideration might be given to a pain treatment program." (*Id.*) Regarding Phillips's mental abilities, the doctor concluded as follows:

> Mental status testing raised the question of
> whether his cognitive functioning might be
> somewhat limited and, given his history of
> special education and unsuccessful attempts to
> get his GED, he may function at a modest level
> of intellectual ability. Formal testing would

11 - FINDINGS & RECOMMENDATION

be necessary to specify the level at which he
functions.

Mr. Phillips described mild deficits in his
ability to perform activities of daily living,
based on his lack of a regular routine. He
appears to have mild deficits in social func-
tioning, based on some degree of social
isolation, although he otherwise described
satisfactory relationships with friends and
family.  He complained of problems with con-
centration, although no gross concentration
deficits were evident during the interview.
Mental status testing raised the question of
whether he might have had some mild problems
in this area.  His persistence during the
evaluation overtly appeared adequate, but he
may have been putting forth inconsistent
effort during mental status testing. His pace
was not formally assessed, but he was able to
complete a background questionnaire adminis-
tered prior to the evaluation in a reasonable
amount of time.  His overall deficits in
concentration, persistence, and pace are esti-
mated to be mild to moderate.  He did not
report a history of any episodes of psycho-
logical decompensation.

Mr. Phillips'[s] mild deficits in his ability
to perform activities of daily living, mild
deficits in social functioning, and mild to
moderate deficits in concentration, persist-
ence, and pace represent the primary psycho-
logical barriers to returning [him] to full-
time, sustained employment.  The reasons for
his memory complaints are unclear, although
his use of narcotic medications could poten-
tially be interfering with his cognitive
efficiency.  He left his last job due to his
cognitive complaints, and it is the only job
where he worked after having the lumbar fusion
which led to his reliance on narcotic pain
medications.  If he can be weaned from his
current medications or prescribed medications
which have fewer cognitive effects, such as
medications like Suboxone, it is possible that
his cognitive abilities might improve.  In the
interim, Mr. Phillips appears to be capable of
managing any disability benefits which may be
awarded to him.

(A.R. 282-83)

12 - FINDINGS & RECOMMENDATION

Phillips saw a doctor for pain management and medication review on April 1, 2010. Phillips rated his pain in his right shoulder, mid back, and left knee at 7/10. His pain medications were refilled without change. Notes also indicate the doctor "wrote a letter for [Phillips's] assistance dog (for depression)[.]" (A.R. 311)

On April 3, 2010, Phillips saw physiatrist Avinash Ramchandani, M.D. for a functional assessment. (A.R. 285-89) The doctor reviewed Phillips's past medical records, and his current complaints, which included low back pain, left knee pain, and left shoulder pain. The doctor noted Phillips's history included "memory loss." (A.R. 286) After examining Phillips, the doctor concluded Phillips could stand, walk, sit, and lift, with no restrictions. The doctor further concluded Phillips had no postural, manipulative, visual, communicative, or environmental limitations. (A.R. 288)

On April 14, 2010, psychologist Robert Henry, Ph.D. reviewed the record and completed a Psychiatric Review Technique form (A.R. 290-301). Relying largely on Dr. Wicher's report, Dr. Henry concluded Phillips was only partially credible. (A.R. 301) He opined Phillips would have only mild limitations in his activities of daily living, social functioning, and maintaining concentration, persistence, or pace. (A.R. 299) As a result, Dr. Henry concluded Phillips's mental impairment is "non severe." (A.R. 301)

Also on April 14, 2010, internist Sharon B. Eder, M.D. reviewed the record, and concluded Phillips "is physically non severe." (A.R. 303)

13 - FINDINGS & RECOMMENDATION

1    Phillips was seen for medication review on April 30, June 1,
2  and June 30, 2010.  On each visit, his pain medications were con-
3  tinued without change.  (A.R. 305-11)

4    On October 6, 2010, Phillips saw psychologist Karen Bates-
5  Smith, Ph.D. for a neuropsychological evaluation to assess his
6  "memory problems" and intellectual abilities.  (A.R. 334-44)  The
7  doctor reviewed Phillips's medical records, conducted a full
8  clinical evaluation, and administered several tests.  Regarding
9  Phillips's current complaints and activities of daily living, the
10  doctor noted the following:

11        [Complains of] pain, headaches, shortness of
        breath, anxiety, depression, severe stomach
12        pain.  Re: dressing, tires easily, has prob-
        lems bending light headed upon standing up at
13        times.  Re: shaving, is shaky at times.  Needs
        no reminders to take his medications.  Pre-
14        pares some meals.  Wife does most of the
        chores.  Does not drive.  Shops w/wife, but is
15        slow and has [shortness of breath].  Pays
        bills.  No hobbies.  Attends church sometimes.
16        Is easily agitated.  Has physical limitations,
        plus problems completing tasks, concentrating,
17        and getting along w/others.  He did not check
        memory as a problem area.  Is paranoid at
18        times. . . .

19        *    *    *

20        Chief Complaint: "I had an L4-5 fusion done to
        my back.  I have short-term memory loss.  I
21        have right shoulder pain.  My left knee had
        surgery last year."
22
        1.    Back pain: Mr. Phillips had an L4-5 fusion
23              done in 1999.  He was injured while checking
              for a gas leak on a vehicle; the driver popped
24              the clutch and threw him 10 feet away.  He
              says he was in a wheelchair for a year.
25
        2.    Right shoulder pain.  While on a Tri-Met bus,
26              Mr. Phillips put out his right arm to prevent
              a large man from falling when the bus driver
27              took off suddenly.

28

14 - FINDINGS & RECOMMENDATION

1        3.   Left knee pain. Mr. Phillips has trouble
2             walking due to that pain. He had an ACL
             replacement.

3 (A.R. 335)

4    Regarding his mental functioning, Phillips provided the

5 following history:

6        4.   Memory problems. Onset was in childhood.
             Mr. Phillips has had multiple head injuries.
7             One occurred from a bike accident. He was
             riding down a hill, hit a telephone pole guide
8             wire, and was thrown "100 feet" up into a pine
             tree before dropping to the ground. He esti-
9             mates that he lost consciousness for about 15
             minutes. He went to an emergency room for a
10            while, but was not hospitalized. He says his
            memory problems have been getting progres-
11            sively worse. He can't remember what he
            reads. He can remember numbers, such as both
12            bank account numbers. But he has problems
            remembering appointments and directions that
13            people give him. He forgets where he left his
            keys and sometimes to shave. He said also
14            that time goes by a little faster for him than
            for other people. He does not think that his
15            memory problems affect his relationship with
            his wife.

16

17        5.   ADHD. Mr. Phillips says that his ADHD was
             first diagnosed at age 8 or 9 and that he was
             treated with Ritalin for a while. Current
18            symptoms are as follows:
                a.   He makes careless mistakes.
19                b.   He has difficulty maintaining atten-
                     tion and concentration.
20                c.   He appears to others to not listen
                     well.
21                d.   He fails to finish chores or work
                     because he doesn't remember what he
22                     is doing.
                e.   He is poor at organizing tasks.
23                f.   He loses things all the time.
                g.   He is easily distracted.
24                h.   He is often forgetful.
                i.   He fidgets and squirms [due to]
25                     pain.
                j.   When he was in school, he would
26                     leave his seat frequently.
                k.   He is restless.
27                l.   He is impatient.

28

15 - FINDINGS & RECOMMENDATION

6. Depression. Onset was about 6 years ago. It was worst when he was in a wheelchair for a year "with a pinched nerve in my spine that they wouldn't treat." On Zoloft, he feels depressed on and off. For fun, he watches TV, lies on his bed, walks around for a while, then lies down again. He used to play soccer professionally, do rock-climbing, camp, back-pack, hike, and bike. It is not so much that he has lost interest in these activities than that he is no longer able to do them phy-sically. Appetite is fine. He stands 5 ft. 8 in. tall and weighs 190 lb. Weight fluctuates some. He has sleep difficulties, but sleeps 12 hours per day on average. Energy level is fair [due to] pain. He feels worthless because he is unable to provide for his family. He has problems concentrating, as mentioned. He has [suicidal ideations] once in a while, but not currently.

(A.R. 335-36)

Testing revealed that Phillips has a Full Scale IQ of 70. Verbal comprehension and perceptual reasoning skills were in the borderline range. His verbal comprehension was "significantly higher (better) than working memory[.]" (A.R. 340) All of his memory skills scores (for auditory, visual, immediate, and delayed memory) fell "in the low average to average range," with his working memory "in the extremely low range." (*Id.*) Phillips exhibited problems with reasoning skills, initiation, and per-sistence. (*Id.*) The doctor noted Phillips was pleasant and cooperative, and appeared to give good effort on the testing. (A.R. 338)

The doctor diagnosed Phillips with Borderline Intellectual Functioning; Cognitive Disorder, NOS; Dysthymic Disorder; Rule Out ADD; and Alcohol and Cannabis Abuse, in full sustained remission. (A.R. 341) She opined Phillips would be "able to understand and remember at least simple, routine instructions." His pace during

1  the testing was normal, and he showed good task persistence.  (A.R.
2  342)  He had some difficulty "judging line angles," and "switching
3  categories, . . . suggesting the possibility of some executive
4  function problems." (A.R. 341)  His "low working memory" suggests
5  that he may have ADD, although the doctor lacked sufficient objec-
6  tive developmental information to actually make that diagnosis.
7  (*Id.*)  The doctor opined Phillips would be able to manage disa-
8  bility funds, should they be awarded.  (A.R. 342, 344)

9      On November 3, 2010, clinical psychologist Dorothy Anderson,
10 Ph.D. reviewed the record and completed a Psychiatric Review Tech-
11 nique form (A.R. 346-58), and a Mental Residual Functional Capacity
12 Assessment form (A.R. 360-62).  Dr. Anderson indicated Phillips
13 would be moderately limited in his ability to understand, remember,
14 and carry out detailed instructions; interact appropriately with
15 the general public; be aware of normal hazards and take appropriate
16 precautions; and set realistic goals or make plans independently of
17 others.  (A.R. 360-61)  Dr. Anderson also indicated Phillips would
18 have moderate limitations in his ability to maintain concentration,
19 persistence, or pace, and in maintaining social functioning; and
20 mild limitation in restriction of his activities of daily living.
21 (A.R. 356)  The diagnostic categories upon which she based her
22 opinion included Borderline Intellectual Functioning, Dysthymic
23 Disorder, Panic Disorder Without Agoraphobia, and Polysubstance
24 Abuse (alcohol and cannabis abuse in full sustained remission, and
25 current dependence on opioids).  (A.R. 346-54)

26      On January 1, 2011, Phillips fell on his back porch, rolling
27 his ankle, and falling onto his knees and elbows.  He saw a nurse
28 practitioner at his primary care physician's office on January 5,

17 - FINDINGS & RECOMMENDATION

2011, complaining of severe, throbbing pain, and significant swelling of his ankle. He rated his pain at 10/10, and stated his routine pain medications were not helping this pain, which was keeping him up at night. He was given prescriptions for Robaxin and Naprosyn, and an MRI of his ankle was ordered. He was directed to return in two weeks for further evaluation. (A.R. 496) However, although he saw a different nurse practitioner on January 19, 2011, for complaints of a cough, fever, chills, and an earache, the progress notes do not mention his ankle at all, *see* A.R. 494-95, and no further treatment notes regarding the ankle injury appear in the administrative record.

Phillips saw a nurse practitioner on February 18, 2011, for medication refills. At this time, he was taking Lexapro for anxiety and depression; Atenolol for hypertension; Guiafenesin for chest congestion; and Naprosyn, Percocet, and MS Contin for pain. (A.R. 492)

On March 15, 2011, Phillips saw a nurse practitioner for a complaint of chest pain. Phillips stated he had been "breathing in mold spores at [his] house," and he had been coughing, wheezing, and sneezing daily for two weeks. He stated it was painful for him to breathe. The nurse practitioner prescribed an inhaler for Phillips's breathing problems. He also was taking MS Contin 30 mg., one tablet three times daily for pain; Percocet 7.5-325, one to two tablets three times daily for pain; Naprosyn 500 mg. as needed for pain; Lexapro for depression; Atenolol 25 mg./daily for hypertension; Hydroxyzine (an antihistamine); and Guiafenesin (an expectorant). (A.R. 490-91) His medications were refilled on April 15, 2011. (A.R. 488-89)

18 - FINDINGS & RECOMMENDATION

1    On May 13, 2011, Phillips saw naturopathic doctor John
2  Reynolds, N.D. for a medication review, and evaluation of com-
3  plaints of "left shoulder and knee popping" and pain in his lumbar
4  spine. (A.R. 486)  His medications were refilled without change.
5  (A.R. 486-87)

6    On June 9, 2011, Phillips was admitted into the hospital
7  through the emergency room, in connection with a complaint of chest
8  pain. (*See* A.R. 364-466)  Phillips stated he was driving his car
9  when he "had the onset of chest pressure and pain." (A.R. 366)  A
10 nuclear myocardial perfusion study showed "a reversible defect in
11 the territory of the right coronary artery." (*Id.*)  Phillips was
12 evaluated by a cardiologist, who opined Phillips likely would
13 respond well to medical treatment.  Phillips was continued on beta-
14 blocker, aspirin, and statin therapy, and an ACE inhibitor was
15 added to his medication regimen.  He was advised to stop smoking,
16 and was directed to follow up with the cardiologist in four weeks.
17 (A.R. 366-67)  His discharge diagnosis was "Chest pain, likely
18 secondary to angina." (A.R. 366)

19    Phillips saw Dr. Reynolds on July 1, 2011, for a medication
20 review.  Phillips complained of increased back pain, which he rated
21 at 7/10.  He stated he had been under stress recently, and had not
22 been feeling well.  He complained that Lexapro was not working well
23 to control his depression, but the medication was continued without
24 change.  His Percocet dosage was decreased, and the doctor
25 indicated he wanted to get the Percocet dosage down to 120 tablets
26 per month (currently at 150).  Phillips was continued on MS Contin
27 30 mg., one tablet twice daily. (A.R. 483-84)

28

19 - FINDINGS & RECOMMENDATION

1    Phillips saw a nurse practitioner for medication review on
2  July 20, 2011.  His current pain medications were refilled without
3  change.  (A.R. 481-82)

4    On September 2, 2011, Phillips saw naturopathic doctor
5  Margaret Walsh, N.D. for a medication review.  Phillips indicated
6  "his back pain [was] being well controlled by current medication
7  protocol."  (A.R. 479)   His medications were refilled without
8  change.

9    On October 20, 2011, Phillips saw naturopathic doctor Andrew
10 Murison, N.D. for a medication review.  Examination revealed ten-
11 derness to palpation over Phillips's entire spine.  His medications
12 were continued without change.  (A.R. 477-78)

13

14           **B.  Phillips's Testimony**

15 **1.  Hearing Testimony**

16    Phillips lives in Vancouver, Washington, with his wife and
17 twenty-year-old son.  Both his wife and son are disabled due to
18 schizophrenia and other mental disorders.  (A.R. 509-10) Since
19 2008, the only work Phillips has done is taking care of his son on
20 a daily basis, for which the State of Washington pays Phillips $400
21 a month.  He manages his son's medications, cooks his meals, and
22 generally "keep[s] him in control."  (A.R. 510-11)

23    Phillips is 5'8" tall, and weighs about 172 pounds.  (A.R.
24 536)  He completed the eighth grade in school, and was in special
25 education for all subjects throughout school.  He left school
26 because, according to Phillips, he only had a 0.1 grade point
27 average, and was told he would not make it to graduation.  He has
28 taken the GED exam three times, but has yet to pass, due to his

20 - FINDINGS & RECOMMENDATION

1  inability "to learn new things." (A.R. 512)  He stated he is
2  unable to work full time for the same reason; i.e., he "can't learn
3  new things and remember them." (A.R. 513)  He has had this problem
4  learning new things since 2001. (A.R. 517)

5      Phillips suffered a head injury in a bicycle accident when he
6  was ten years old.  He stated he was riding downhill, and was
7  unable to turn a corner, causing his bike to get "wired to a
8  telephone pole," catching his tire and throwing him a hundred feet
9  up into a pine tree before he fell back to the ground. (*Id.*)

10      Phillips stated he has "a lot of pain all the time." (*Id.*)
11  He has the most pain in his back, shoulder, and left knee.  He has
12  undergone two knee surgeries for "ACL replacement," that have left
13  it difficult for him to move around.  He estimated he can walk
14  about thirty feet, and he can only stand for "[a]bout three
15  minutes," before he must stop and rest. (A.R. 514)  He can sit for
16  fifteen to twenty minutes before he needs to stand up.  According
17  to Phillips, a doctor suggested he use a cane when he walks, and
18  Phillips uses a cane intermittently. (*Id.*)  He is unable to lift
19  even as much as a gallon of milk. (*Id.*)

20      Phillips stated he has had back pain constantly since a car
21  accident in 1999, which resulted in two spinal fusion surgeries.
22  To treat his pain, he takes Morphine and Percocet, and he spends a
23  lot of time lying down.  Generally, he lies down once or twice a
24  day, for two to four hours at a time. (A.R. 515-16)  He takes the
25  Percocet twice a day, first thing in the morning and then right
26  before he goes to bed.  He is able to drive a car, and he runs his
27  errands in the evening, when the morning dose of Percocet has worn
28  off. (A.R. 516-17)  Phillips's problems with walking, standing,

21 - FINDINGS & RECOMMENDATION

1  and lifting all began with the 1999 accident. (A.R. 517-18)
2  Phillips stated he takes his pain medications as prescribed. The
3  primary side effect he experiences is ongoing constipation. (A.R.
4  518)

5      According to Phillips, his doctor has suggested he have heart
6  surgery.[5] (A.R. 518)  Phillips's heart problem is exacerbated by
7  stress, so he tries to stay calm. When he gets stressed, it causes
8  his heart to "fluctuate" and gives him chest pain. (A.R. 519) He
9  had gone to the hospital a few days prior to the hearing due to
10 "bowel bleeding in [his] rectum . . . from eating [a] Taco Bell
11 flatbread sandwich." (Id., A.R. 528) On the way to the hospital,
12 he developed chest pain. He had nitroglycerine in the car, but it
13 had gotten wet "from rain getting in the window . . . so it was
14 destroyed." (A.R. 529) When he was in the hospital, he was given
15 patches to help him stop smoking, but after his release, he was
16 unable to afford the patches so he went back to smoking. At the
17 time of the hearing, he was smoking about a pack a day. He stated
18 he could "quit instantly" if his doctor told him to, but according
19 to Phillips, no doctor has told him to stop smoking altogether;
20 they have told him only to "slow down." (A.R. 519, 525-26)

21     Phillips stated he was diagnosed with depression and anxiety
22 about six years prior to the hearing. (A.R. 520)  He takes
23 Lexapro, but still sometimes "feel[s] like committing suicide."
24 (A.R. 521)  He attempted suicide once, a long time ago. (Id.)

25     Phillips indicated his wife used to take care of most of the
26 housework, such as cooking, cleaning, and laundry, but now she has

27 _____

28     [5]I find nothing in the medical record to support that this
   recommendation was made.

1  a care giver to do those tasks for her. Phillips's wife got the
2  care giver about three months prior to the hearing. At that time,
3  she was coming three times a week, but he stated she was going to
4  increase to five visits a week. Phillips does all of the cooking
5  for himself and his son. (A.R. 522)

6      Phillips has a large dog, a Blue Heeler-German Shepherd mix.
7  He takes the dog for short walks to the mailbox, "about 100 yards."
8  (A.R. 523) He has a large back yard where the dog is able to run
9  without a leash. The dog "is also a service animal" for Phillips,
10 and helps him carry groceries. (*Id.*)

11     Phillips stated he enjoys watching football on television, and
12 playing video games. Until about six months earlier, he had a
13 PlayStation 3, and he enjoyed playing football, baseball, and golf
14 games for several hours a day with his son, although Phillips
15 stated he was never any good at the games. He had to sell the
16 PlayStation to get money for living expenses, and he indicated he
17 misses the PlayStation "very much." (A.R. 525; *see* A.R. 523-24)
18 He also played guitar for about six months, but he pawned the
19 guitar because his right shoulder began hurting when he tried to
20 play. In addition, when he played guitar, his family complained
21 about the noise. (A.R. 524-25)

22     Phillips acknowledged that he used to have problems abusing
23 alcohol and marijuana, but it was "[a] long time ago." (A.R. 526)
24 He completely stopped using marijuana at age 20, and alcohol at age
25 24. (*Id.*)

26     Phillips stated that during the previous three years, his
27 family's financial problems had gotten worse. First, they had to
28 move from their Section 8 housing when their residence flooded due

23 - FINDINGS & RECOMMENDATION

1  to a backed up sub-drain.  He explained that they all got "very
2  sick and . . . were all put on rescue inhalers and told to move
3  immediately."  (A.R. 527)   They did, but then they lost their
4  Section 8 eligibility because they had moved without giving thirty
5  days' notice.  (*Id.*)  They were homeless for three weeks, and lived
6  at a campground while waiting for a decision on their Section 8
7  eligibility.  (A.R. 528)  In addition, they got a car because they
8  needed transportation to "go to the hospital and get food and
9  stuff," but they had been unable to make their car payment for the
10 past three months.  (A.R. 527)

11      Phillips had ACL surgery after he was hit by a drunk driver
12 while walking his dog.  He stated he "landed on [his] head and two
13 officers saw it happen."  (A.R. 530)  He has memory loss from the
14 accident, so he may watch a movie one night, and not remember it
15 the next night.  (A.R. 530)

16

17 *2.    Written Testimony*

18      On January 18, 2010, Phillips completed a Pain & Fatigue Ques-
19 tionnaire (A.R. 133), and a Function Report (A.R. 134-41).
20 Phillips indicated he has a Charley horse-type pain in his
21 shoulders, burning pain in his back and neck, and tingling and
22 numbness in his hands.  He has pain every night and morning.  He
23 indicated he had been learning to play the guitar, but it had begun
24 causing pain.  "Movements" make his pain worse, while lying down
25 makes the pain better.  (A.R. 133)

26      Regarding fatigue, Phillips indicated he is always tired, but
27 he noted this is probably due to his medications.  He stated he can
28 be up and active for only fifteen to twenty minutes before he needs

to rest.  He also indicated his back was beginning to hurt from writing responses on the form.  (*Id.*)

Phillips described his daily activities as watching television, laying in bed, going to the store, and taking his dog out to "poddy."  (A.R. 134)  He stated a friend helps him feed his dog.  Phillips used to run, bend, play sports, go rock climbing, and ski, but he is not able to engage in those activities now.  His pain affects his sleep.  He has no difficulties with his personal care, although his wife has to remind him to shower.  He does his own cooking, which takes ten to twenty minutes a day.  He stated he used to be a gourmet cook, but he is not able to cook much anymore. He is able to drive, and he makes short trips to the store, returning to bed when he gets back home.  He is able to handle his own money, although he sometimes forgets to write down checks, causing his account to "come up short."  He indicated he used to be better at handling his money until his memory problems began.  He enjoys watching football and playing video games, but he misses being able to play "real sports."  He has a couple of friends that he spends time with occasionally.  (A.R. 134-38)

Regarding his abilities, Phillips indicated he has difficulty with all types of movement due to pain, and he spends much of his time lying down.  He has difficulty paying attention.  He does not follow written instructions well, and has difficulty finishing what he starts, indicating "small tasks work best" for him.  (A.R. 139) He sometimes has trouble getting along with authority figures, such as his bosses at former jobs, and the manager of his apartment complex.  (*Id.*)  He does not handle stress well, indicating stress gives him "tiny chest pains."  (A.R. 140)  According to Phillips,

25 - FINDINGS & RECOMMENDATION

1  a doctor prescribed a walker for him about four years earlier, and

2  he sometimes uses the walker or a cane when walking.  He indicated

3  he has been unable to work since 2001, due to pain.  (A.R. 140-41)

### C.  Third-Party Testimony

On January 23, 2010, John Ladd, a friend of Phillips's, com-
pleted a third-party function report regarding Phillips.  (A.R.
158-65)  Ladd indicated he has known Phillips for six years.  He
sometimes watches television with Phillips, and he helps Phillips
take care of his dog.  Ladd's responses on the questionnaire mirror
Phillips's responses on his own questionnaire, most of them nearly
word-for-word.  (*See id.*)

### D.  Vocational Expert's Testimony

The ALJ instructed the VE to assume that Phillips is unable to
perform any of his past work.  (A.R. 532)  The ALJ asked the VE to
consider an individual with the same age, education, and work
background as Phillips, with the following limitations:

> Can perform light,[*sic*] work at light
> exertional level with the following exceptions
> or changes to that.  First he's limited to
> jobs involving simple repetitive tasks.  His
> postural non-exertional limitations allow for
> no more than occasional bending, balancing,
> stooping, kneeling, crouching or crawling.
> He's limited to climbing ropes, ladders,
> scaffolding to no more than occasionally.
> Same with climbing stairs and equivalent
> ramps.  Can do no more than occasional
> overhead reaching with either his right or
> left upper extremities.  He should avoid
> working around hazards such as working at
> unprotected heights or around machinery with
> exposed moving parts.

(A.R. 532-33)

26 - FINDINGS & RECOMMENDATION

1    The VE gave examples of three jobs a person with this hypo-
2 thetical residual functional capacity could perform, to-wit: small
3 products assembler, parking lot attendant, and ticket seller.  All
4 three of those jobs are unskilled, with a light exertion level, and
5 an SVP of 2.[6]   The VE indicated if the individual would have to
6 "miss two or more days of work per month due to physical or mental,
7 severe physical or mental impairments," those absences would
8 "exceed[] the vocational standards so such a person would not be
9 able to sustain full-time competitive employment."  (A.R. 534-35)

10    If the hypothetical individual described in the ALJ's question
11 also had a severe memory impairment that prevented him from
12 learning "even simple routine repetitive tasks," he also would not
13 be able to sustain competitive full-time employment.  (A.R. 535)
14 And if the initial hypothetical individual "suffered from a mental
15 impairment that would reduce their productivity in such a way that
16 they would be 25 percent slower or produce 25 percent less than
17 that of the average worker," that, too, would "exceed[] vocational
18 standards and such a person most likely would be fired from full-
19 time employment."  (*Id.*)

20

21

---

22    [6]Jobs are classified with an "SVP," or level of "specific
23 vocational preparation" required to perform the job, according to
   the *Dictionary of Occupational Titles*.  The SVP "is defined as the
24 amount of lapsed time required by a typical worker to learn the
   techniques, acquire the information, and develop the facility
25 needed for average performance in a specific job-worker situation."
   *Davis v. Astrue*, slip op., 2011 WL 6152870, at *9 n.7 (D. Or.
26 Dec. 7, 2011) (Simon, J.) (citation omitted).  "The DOT identifies
   jobs with an SVP level of 1 or 2 as unskilled, jobs with an SVP of
27 3 or 4 as semi-skilled, and jobs with an SVP of 5 or higher as
   skilled." *Whitney v. Astrue*, slip op., 2012 WL 712985, at 3 (D. Or
28 Mar. 1, 2012) (Brown, J.) (citing SSR 00-4p).

### III.   DISABILITY DETERMINATION AND THE BURDEN OF PROOF

#### A.   Legal Standards

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

"Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Commissioner*, 648 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520).  The *Keyser* court described the five steps in the process as follows:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments described in the regulations?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f) and 416.920 (b)-(f)).  The claimant bears the burden of proof for the first four steps in the process.  If the claimant fails to meet the burden at any of those four steps, then the claimant is not disabled.  *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth general standards for evaluating disability), 404.1566 and 416.966

1  (describing "work which exists in the national economy"), and
2  416.960(c) (discussing how a claimant's vocational background
3  figures into the disability determination).

4      The Commissioner bears the burden of proof at step five of the
5  process, where the Commissioner must show the claimant can perform
6  other work that exists in significant numbers in the national
7  economy, "taking into consideration the claimant's residual
8  functional capacity, age, education, and work experience." *Tackett*
9  *v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner
10 fails meet this burden, then the claimant is disabled, but if the
11 Commissioner proves the claimant is able to perform other work
12 which exists in the national economy, then the claimant is not
13 disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R.
14 §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

15     The ALJ also determines the credibility of the claimant's
16 testimony regarding his or her symptoms:

17          In deciding whether to admit a claimant's
            subjective symptom testimony, the ALJ must
18          engage in a two-step analysis. *Smolen v.*
            *Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).
19          Under the first step prescribed by *Smolen*,
            . . . . the claimant must produce objective
20          medical evidence of underlying "impairment,"
            and must show that the impairment, or a combi-
21          nation of impairments, "could reasonably be
            expected to produce pain or other symptoms."
22          *Id.* at 1281-82. If this . . . test is satis-
            fied, and if the ALJ's credibility analysis of
23          the claimant's testimony shows no malingering,
            then the ALJ may reject the claimant's testi-
24          mony about severity of symptoms [only] with
            "specific findings stating clear and con-
25          vincing reasons for doing so." *Id.* at 1284.
26 *Batson v. Commissioner*, 359 F.3d 1190, 1196 (9th Cir. 2004).

27

28

29 - FINDINGS & RECOMMENDATION

## B.   The ALJ's Decision

Ths ALJ found Phillips has not engaged in substantial gainful activity since his application date of June 2, 2008.  He found Phillips "has the severe impairment of a back or vertebrogenic impairment, with a history of fusion at L4-5, characterized by the current treating source as lumbago of the lower back." (A.R. 14) He noted Phillips also has "a distant history of lumbar fusion." (A.R. 15)  The ALJ found none of Phillips's other medical conditions constitutes a severe impairment, including his knee surgeries, hypertension, right shoulder pain, chest pain, coronary artery disease, and back pain.  (A.R. 15-16)

Regarding Phillips's mental limitations, the ALJ found his depression, and other "somewhat vague mental health conditions," to be mild and nonsevere, noting none of them causes more than a minimal limitation in Phillips's ability to perform basic mental work activities.  (A.R. 16)

The ALJ found Phillips does not have any impairment that meets or equals the severity of any impairment listed in the regulations. He found that Phillips has the following residual functional capacity ("RFC"):

> [Phillips] has the residual functional capacity to perform light work . . . except limited by lifting and carrying no more than 10 pounds frequently and occasionally; pushing and pulling with both the upper and lower extremities also limited to no more than 10 pounds; bending, balancing, stooping, kneeling, crouching, crawling, and climbing ropes, ladders, and scaffolds limited to occasional; and overhead reaching with both the right and left upper extremities limited to occasional. Also included is the preclusion of working around hazards such as unprotected heights and machinery with exposed moving parts due to the side effects of chronic narcotic pain

30 - FINDINGS & RECOMMENDATION

1            medication use, and work that is simple,
2            routine, and repetitive, again due to narcotic
             opioid pain medication side effects.

3  (A.R. 17)

4       The ALJ found Phillips's subjective complaints less than fully
5  credible, to the extent he alleges limitations in excess of the
6  ALJ's RFC assessment.  (A.R. 19)  In support of this finding, the
7  ALJ noted Phillips reads the Bible, cooks for his son, and manages
8  his son's medications.  He manages all of the family's funds,
9  including being his wife's representative payee for her disability
10 payments.  Phillips pays the bills, does the shopping, and "has an
11 adequate awareness" of financial matters as evidenced by his
12 testimony "regarding financial difficulties with payments on a car
13 loan."  (A.R. 18)

14      The ALJ observed that when Phillips testified he can only sit
15 for fifteen to twenty minutes at a time, "he had already been
16 seated at the hearing for 40 minutes and was not exhibiting any
17 apparent discomfort."  (*Id.*)

18      The ALJ noted that on the third-party function report, Ladd
19 indicated Phillips uses a walker, "a fact not seen in any medical
20 record, and not even reported by the claimant."  (A.R. 19)  How-
21 ever, as noted above, Phillips, himself, testified that the walker
22 was prescribed for him by a doctor, and he uses the walker or a
23 cane sometimes when walking.  Ladd's questionnaire responses simply
24 copied Phillips's responses virtually word-for-word.  Thus, the ALJ
25 was mistaken in saying Phillips had not reported using a walker.

26      The ALJ noted Ladd described Phillips "as highly functional in
27 multiple areas," including "driving, traveling independently,
28 caring for a pet, shopping, managing finances, attending to his own

31 - FINDINGS & RECOMMENDATION

grooming and care, preparing meals daily, assisting his wife and son, watching television, and playing games on a PlayStation." (*Id.*)  The ALJ found this level of functioning to be "inconsistent with disability." (*Id.*)  The ALJ indicated that although Ladd's information was "considered credible," his report of Phillips's activities reflected "a higher level of functioning than reported by [Phillips]." (*Id.*)  Again, this conclusion fails to recognize that Ladd's report was nearly identical to Phillips's own function report.   Thus, the ALJ's finding that Ladd was "considered credible," while Phillips was not, is contradictory.

The ALJ found the medical evidence of record does not support Phillips's allegations concerning either his physical difficulties or his mental problems.  Phillips's "continuing complaints of knee pain are contradicted by [his] treatment records," (*id.*) which evidence only minimal pain and unimpeded functioning. (A.R. 19-20)  Further, despite Phillips's allegations of severe pain and mental distress, the ALJ noted Phillips "consistently and repeatedly" described his activities to treating sources in a manner that evidenced someone "who is unimpaired and fully functioning." (A.R. 20)  In addition, the ALJ found Phillips sought medical treatment "routinely for problems that have mostly resolved, and he appears to report a greater propensity than average for mishaps." (*Id.*)

Although the ALJ acknowledges that Phillips's medical records consistently show he has tenderness to palpation throughout his back, the ALJ found the absence of additional findings, "in particular neurological changes, is critical in demonstrating the benign nature of [his] vertebrogenic impairment." (*Id.*)  The ALJ observed that Phillips's doctors continued to prescribe him both MS

1  Contin and Percocet for his complaints of ongoing, significant
2  pain, "despite the absence of objective severity." (*Id.*)  The ALJ
3  summarized that, as a whole, Phillips's treatment records showed
4  him to be "functional, with minimal, or no, physical and mental
5  deficits, and to be managing effectively."  (*Id.*)

6       The ALJ gave great weight to Dr. Ramchandani's consultative
7  evaluation of April 3, 2010.  The ALJ found the evaluation to be

8              both extensive and comprehensive, with range
               of motion in all joints essentially normal;
9              straight leg raising normal in both sitting
               and supine position; no evidence of foot drop
10             bilaterally;  gross  and  fine  motor  skills
               intact in all respects; full motor strength
11             and muscle bulk and tone in all extremities; a
               normal sensory exam; all reflexes normal; and
12             all tests negative.

13  (A.R. 20-21)  The ALJ indicated the limitations he had included in
14  Phillips's RFC were based on Phillips's "symptoms and medication
15  side effects," rather than on demonstrated functional limitations.
16  (A.R. 21)

17       The ALJ noted that although Phillips has been prescribed anti-
18  depressant medications for some time, "he has no history of mental
19  health treatment, therapy, or counseling." (*Id.*)  Neither of the
20  two consulting psychologists found Phillips to be disabled due to
21  mental problems.  Dr. Bates-Smith found Phillips could "understand
22  and remember at least simple routine instructions," and although
23  his working memory was "extremely low," he demonstrated "normal
24  pace and task persistence." (A.R. 22)  The ALJ indicated that
25  while Phillips "may experience some deficits, his ability to obtain
26  social services, housing, medical treatment, and assistance from
27  other resources is excellent.  Furthermore, his ability to read and
28  complete in writing, questionnaires concerning information about

33 - FINDINGS & RECOMMENDATION

1 his condition and history, would indicate that he may not be as
2 limited intellectually [as] indicated by Dr. Bates-Smith[.]" (*Id.*)

3      The ALJ concluded that his RFC was "supported strongly by the
4 objective medical records," and the ALJ found Phillips "is clearly
5 not as limited as he contends." (*Id.*)

6      The ALJ found Phillips is unable to return to any of his past
7 relevant work.  Although Phillips has limited education, the ALJ
8 found he "has basic reading and writing skills, and is able to
9 communicate in English." (*Id.*)  Based on the VE's testimony, the
10 ALJ found that although Phillips cannot perform the full range of
11 light work, he retains the RFC to perform jobs that exist in
12 significant numbers in the national economy, including small
13 product assembly, parking lot attendant, and ticket seller. (A.R.
14 23)  As a result, the ALJ concluded Phillips is not disabled.
15 (*Id.*)

16

17                    *IV.  STANDARD OF REVIEW*

18      The court may set aside a denial of benefits only if the
19 Commissioner's findings are "'not supported by substantial evidence
20 or [are] based on legal error.'"  *Bray v. Comm'r of Soc. Sec.*
21 *Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v.*
22 *Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black*
23 *v. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1
24 (9th Cir. May 20, 2011).  Substantial evidence is '"more than a
25 mere scintilla but less than a preponderance; it is such relevant
26 evidence as a reasonable mind might accept as adequate to support
27 a conclusion.'"  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035,
28 1039 (9th Cir. 1995)).

34 - FINDINGS & RECOMMENDATION

1    The court "cannot affirm the Commissioner's decision 'simply
2  by isolating a specific quantum of supporting evidence.'" *Holohan*
3  *v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*
4  *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court
5  must consider the entire record, weighing both the evidence that
6  supports the Commissioner's conclusions, and the evidence that
7  detracts from those conclusions.  *Id.*  However, if the evidence as
8  a whole can support more than one rational interpretation, the
9  ALJ's decision must be upheld; the court may not substitute its
10 judgment for the ALJ's.  *Bray*, 554 F.3d at 1222 (citing *Massachi v.*
11 *Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

12    A similar standard applies to judicial review of the Commis-
13 sioner's decision to terminate benefits.  The court will set aside
14 a decision to terminate benefits only when the decision is "based
15 upon legal error" or is "not supported by substantial evidence in
16 the record as a whole."  *Allen v. Heckler*, 749 F.2d 577, 579 (9th
17 Cir. 1984) (citation omitted).  "If the evidence admits of more
18 than one rational interpretation, [the court] must uphold the
19 decision of the ALJ."  *Id.* (citation omitted).

20
21                    ***V.  DISCUSSION***

22    Phillips argues the ALJ erred at steps two, three-to-four, and
23 five of the sequential evaluation process.  Each of Phillips's
24 arguments is addressed below.

25
26           ***A.  Alleged Error at Step Two***

27    Phillips argues the ALJ erred in "failing to recognize [his]
28 severe mental impairments at step two" of the evaluation process,

35 - FINDINGS & RECOMMENDATION

which, therefore, caused error throughout the remainder of the ALJ's analysis. Dkt. #12, p. 6. Specifically, Phillips argues the record contains substantial evidence that his "cognitive and emotional impairments" are severe. He points to the following evidence in support of his argument:

1.  He was in special education classes throughout school, and "was held back in a number of grades, including kindergarten." Dkt. #12, p. 8 (citing A.R. 337).

2.  He quit school in the ninth grade, and he has been unable to pass the GED exam. *Id.*

3.  Consultative examiner Dr. Bates-Smith administered testing which indicated Phillips has a Full Scale IQ of 70. She diagnosed Phillips with borderline intellectual functioning, depression, and dysthymic disorder. *Id.*, pp. 8-9 (citing A.R. 336, 341)

4.  State-agency examiner Dr. Anderson also diagnosed Phillips with borderline intellectual functioning and depression. She found Phillips would be moderately limited in his ability to understand, remember, and carry out detailed instructions; interact appropriately with the general public; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently of others. She also opined he would have moderate limitations on his ability to maintain concentration, persistence, or pace; moderate limitations on his ability to maintain social functioning; and mild limitations on his activities of daily living. *Id.*, p. 9 (citing A.R. 349-56, 361).

36 - FINDINGS & RECOMMENDATION

1    Phillips argues the ALJ failed to consider all of this
2   evidence, "and the combined effect of the impairments recognized
3   therein," in rendering his opinion that Phillips's mental impair-
4   ments are non-severe. *Id.*, pp. 9-10. In particular, in the ALJ's
5   discussion, he concluded Phillips was only mildly limited in all
6   four of the broad functional domains, without acknowledging or dis-
7   cussing Dr. Anderson's opinion that Phillips is moderately limited
8   in at least two of those domains.

9    Phillips claims that because the ALJ concluded his mental
10  impairments were not severe, the ALJ did not include limitations
11  related to those impairments in his questions to the VE, or in
12  formulating Phillips's RFC. He argues the ALJ failed to follow the
13  applicable regulations and Social Security Rulings in evaluating
14  his mental impairment. *See id.*, pp. 6-10.

15   Although the Commissioner disagrees that the ALJ erred in his
16  analysis of Phillips's mental impairment, the Commissioner argues
17  any such error at step two of the evaluation was harmless because
18  the ALJ resolved step two in Phillips's favor, and included all of
19  Phillips's impairments, including his mental limitations, in the
20  RFC assessment. According to the Commissioner, by limiting
21  Phillips to simple, routine, repetitive work, the ALJ properly
22  accounted for Phillips's mental limitations. Dkt. #16, p. 9; *see
23  id.*, pp. 5-9.

24   Phillips replies that the ALJ's error was not harmless because
25  the RFC assessment fails to account for "other indications of
26  additional imitations from [Phillips's] depression and borderline
27  intellectual functioning[.]" Dkt. #17, p. 1. He argues the record
28  evidence demonstrates a much greater impact from his mental

37 - FINDINGS & RECOMMENDATION

impairments than merely limiting him to simple, routine tasks. *Id.*, p. 2. Specifically, Phillips points to the following evidence:

1. Dr. Anderson "noted social limitations, a need for assistance in setting goals and making plans, and the necessity for a non-hazardous work environment." *Id.*, p. 1.

2. Dr. Bates-Smith noted Phillips's "extremely low working memory, which could reasonably be expected to impact [Phillips's] ability to engage in work-related tasks." *Id.*, pp. 1-2.

3. Dr. Wicher found Phillips had "mild to moderate difficulties with concentration, persistence, and pace [which], combined with his deficits in social functioning and ability to perform activities of daily living, present the 'primary psychological barriers to returning to full-time sustained employment.'" *Id.* (quoting A.R. 283).

The Commissioner is correct that an ALJ's failure to find a particular impairment to be severe may be harmless if the ALJ considers any limitations posed by that impairment at Step 4 of the sequential analysis. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (so holding). Thus, what the parties actually are arguing here is the legal sufficiency of the ALJ's RFC assessment. Phillips expands on his challenge to the RFC assessment in his second argument. Therefore, the court will set out the parties' positions on Phillips's second argument before addressing the sufficiency of the RFC assessment.

38 - FINDINGS & RECOMMENDATION

### B.  *Alleged Error at Steps Three to Four*

In his second assertion of error, Phillips argues that in formulating his RFC assessment, the ALJ failed to account for limitations found by Dr. Anderson.  To review, Dr. Anderson diagnosed Phillips with Borderline Intellectual Functioning, Dysthymic Disorder, Panic Disorder Without Agoraphobia, and Polysubstance Abuse (alcohol and cannabis abuse in full sustained remission, and current dependence on opioids).  She indicated Phillips would have moderate limitations his ability to (1) understand, remember, and carry out detailed instructions; (2) interact appropriately with the general public; (3) be aware of normal hazards and take appropriate precautions; (4) set realistic goals or make plans independently of others; (5) maintain concentration, persistence, or pace; and (6) maintain social functioning.  (A.R. 356, 360-61)  She further found Phillips would have mild limitation in restriction of his activities of daily living.  (A.R. 356)  Phillips argues that, despite finding Dr. Anderson's reports to be consistent with the record and affording them great weight (*see* A.R. 22), the ALJ failed to account for all of Dr. Anderson's restrictions, particularly the "credible social limitations," in the RFC assessment.  Dkt. #12, pp. 10-12.

The Commissioner argues Phillips is confusing the checklist portion of the Mental Residual Functional Capacity Assessment ("MRFCA") form, which expressly provides only "summary conclusions derived from the evidence in file" (A.R. 360, section I), with the actual Functional Capacity Assessment at section III of the form, where the medical consultant explains the summary conclusions in narrative form, including "any information which clarifies

39 - FINDINGS & RECOMMENDATION

limitation or function." (A.R. 362) *See* Dkt. #16, pp. 9–10. The Commissioner notes the agency's Program Operations Manual System (POMS) expressly directs adjudicators to use the medical con-sultant's narrative in section III of the form "'as the assessment of RFC.'" Dkt. #16, p. 10 (quoting POMS DI 25020.010(B)(1)); *see, e.g., Israel v. Astrue*, 494 Fed. Appx. 794, 797 (9th Cir. 2012) (ALJ is not required "to separately weigh and consider each checked box in Section I of the MRFCA").

In section III of the MRFCA, Dr. Anderson explained her sum-mary conclusions as follows. Regarding her opinion that Phillips is moderately limited in the ability to understand and remember detailed instructions, Dr. Anderson stated, "[Phillips] is able to remember locations and procedures. [He] is able to remember and perform simple, routine tasks. [He] has difficulty remembering detailed/complex tasks." (A.R. 362)

Regarding her opinion that Phillips is moderately limited in the ability to carry out detailed instructions, Dr. Anderson stated, "[Phillips] is able to carry out simple, routine instruc-tions. [He] has difficulty carrying out detailed/complex instruc-tions. [He] is able to concentrate sufficiently for simple, routine tasks. [He] is able to work in close proximity [to] others. [He] is able to make simple work related decisions. [He] is able to complete a normal workday/workweek." (*Id.*)

Regarding her opinion that Phillips is moderately limited in the ability to interact appropriately with the general public, Dr. Anderson stated, "[Phillips] is able to maintain appropriate hygiene. There is no indication of a need for special supervision. [He] is able to have brief, incidental public contact." (*Id.*)

1    Regarding her opinion that Phillips is moderately limited in
2  the ability to be aware of normal hazards and take appropriate
3  precautions, and to set realistic goals or make plans independently
4  of others, Dr. Anderson stated, "[Phillips] is able to travel
5  independently. [He] would benefit from assistance in setting goals
6  and making plans. [He] should not work in hazardous settings."
7  (*Id.*)

8    The Commissioner notes the small product assembly job identi-
9  fied by the VE, based on the ALJ's RFC assessment, "does not
10 require any contact with the public." Dkt. #16, p. 11. Thus, the
11 Commissioner argues that even if the ALJ erred in failing to
12 including limited contact with the general public in the RFC, the
13 error would be harmless because it would not change the outcome of
14 the case, due to the fact that "there are a significant number of
15 jobs in the national economy that [Phillips] could perform." *Id.*

16    Phillips argues the Commissioner's harmless-error analysis is
17 not supported by any evidence of record. He argues the VE "did not
18 testify to the effect on the occupational base additional
19 limitations would have had." Dkt. #17, p. 2. Pointing to
20 Dr. Anderson's opinion that Phillips "would benefit from assistance
21 in setting goals and making plans," Phillips argues his general
22 need for "vocational guidance and avoidance of hazards could have
23 an impact on the number of competitive positions available to him."
24 *Id.*, p. 3. He urges remand for the purpose of obtaining additional
25 vocational testimony regarding the impact of all of his impairments
26 on his ability to work. *Id.*

27    The court agrees with Phillips that limiting him to simple,
28 routine, repetitive work may fail to account for all of his mental

41 - FINDINGS & RECOMMENDATION

limitations that are demonstrated by substantial evidence of record. The evidence indicates Phillips spent his entire educational career in special education classes, and he was held back in his grade more than once. He has attempted to pass the GED exam at least twice, without success. His educational difficulties are consistent with IQ testing by Dr. Bates-Smith, which indicated Phillips has a Full Scale IQ of 70. Although he has not received psychotherapy or counseling, Phillips's doctors have prescribed medications for memory problems, "severe anxiety" (A.R. 256), and depression, continually since at least September 2008. Dr. Wicher, who performed Phillips's mental status exam, recommended Phillips continue to take medications for depression and anxiety. Although Dr. Wicher indicated Phillips's narcotic pain medications might be causing at least some of his cognitive difficulties, she nevertheless noted the primary psychological barriers to returning him to full-time work included "mild deficits in his ability to perform activities of daily living, mild deficits in social functioning, and mild to moderate deficits in concentration, persistence, and pace." (A.R. 283)

Several months later, Dr. Bates-Smith diagnosed Phillips with borderline intellectual functioning, depression, and dysthymic disorder, and noted Phillips had an "extremely low working memory." (A.R. 283) Dr. Anderson similarly diagnosed Phillips with borderline intellectual functioning and depression, and found he would be moderately limited in several areas of functioning. (*See* A.R. 346-56, 360-61)

"An error is considered to be harmless if it is 'inconsequential to the ultimate nondisability determination' and does not

42 - FINDINGS & RECOMMENDATION

1  negate the validity of the ALJ's ultimate conclusion." *Sims v.*
2  *Astrue*, 2012 WL 364055, at *4 (D. Or. Feb. 2, 2012) (Haggerty, J.)
3  (quoting *Carmickle v. Comm'r*, *Soc. Sec. Admin.*, 533 F.3d 1155, 1162
4  (9th Cir. 2008); citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d
5  1050, 1055 (9th Cir. 2006)).   Here, the court cannot say the
6  outcome of the case would be unaffected had the ALJ properly
7  included all of Phillips's mental limitations in his RFC assess-
8  ment.  Further, after expressly crediting Dr. Anderson's opinion,
9  the ALJ erred in failing to translate Phillips's limitations stated
10 by Dr. Anderson into functional limitations in the RFC. *See Amanti*
11 *v. Comm'r*, 2012 WL 5879530, at *5 (D. Or. Nov. 29, 2012) (Marsh J)
12 (same); *Brink v. Comm'r*, 343 Fed. App. 211, 212 (9th Cir. 2009)
13 ((ALJ erred in failing to include, in hypothetical question,
14 medical opinion accepted by ALJ regarding claimant's limitations);
15 *see also Bickford v. Astrue*, 2010 WL 4220531, at *11-12 (D. Or.
16 Oct. 19, 2010) (King, J) (ALJ, who found claimant had moderate
17 limitations in concentration, persistence, or pace, erred in
18 relying on state agency consultant's opinion that claimant could
19 perform simple, repetitive tasks, where consultant concluded
20 claimant's "mental impairment was not severe to begin with, and who
21 opined that [claimant] had only mild difficulties in concentration,
22 persistence or pace").

23      The ALJ's RFC assessment fails to account for Phillips's
24 mental limitations.  The ALJ's hypothetical question to the VE was
25 based on the incomplete RFC assessment, with the result that the
26 ALJ could not rely on the VE's testimony in identifying jobs
27 Phillips could perform. *See, e.g.*, *Brink*, 343 Fed. Appx. at 212
28 ("A hypothetical question posed to a vocational expert must

43 - FINDINGS & RECOMMENDATION

1 'include all of the claimant's functional limitations, both

2 physical and mental.'") (quoting *Flores v. Shalala*, 49 F.3d 562,

3 570 (9th Cir. 1995)).

4     The ALJ's failure to include all of Phillips's limitations in

5 the RFC assessment requires remand for further proceedings.

6

7                    **C.  *Alleged Error at Step Five***

8     Phillips argues the VE's testimony regarding the jobs he could

9 perform is at odds with the RFC's specification that he is limited

10 to "no more than occasional overhead reaching with either his right

11 or left upper extremities." (A.R. 533)  Phillips argues all of the

12 representative jobs identified by the VE require "frequent

13 reaching," pursuant to the *Dictionary of Occupational Titles*

14 ("*DOT*").  Dkt. #12, pp. 13-14 (citing DOT 706.684-022, 915.473-010,

15 & 211.467-030).  He argues the ALJ erred in failing to acknowledge

16 and resolve this conflict with the VE.  *Id.*, p. 14.

17     The ALJ's question included a limitation of no more than

18 occasional overhead reaching.  The Commissioner argues the VE's

19 identification of small product assembly as one job the hypo-

20 thetical person could perform "confirmed that [the individual]

21 would be required to perform no more than occasional overhead

22 reaching."  Dkt. #16, p. 12.  The Commissioner cites *Kassebaum v.*

23 *Commissioner of Social Security*, 420 Fed. Appx. 769, 771 (9th Cir.

24 2011), in support of this argument, quoting the *Kassebaum* court's

25 finding that "the ALJ elicited testimony from the vocational expert

26 confirming that [the identified] jobs do not require 'more than

27 occasional overhead reaching . . . [w]ith the right dominant arm.'"

28 *Id.*  Although no specific testimony about reaching requirements was

44 - FINDINGS & RECOMMENDATION

1  elicited from the VE in the present case, the VE stated her testi-
2  mony was consistent with the *DOT*.  (A.R. 534)  The Commissioner
3  argues Phillips was not prevented from reaching in *any* direction,
4  and Phillips has cited no evidence indicating the small product
5  assembler job, at least, requires *overhead* reaching.  Dkt. #16,
6  pp. 13-14.  Thus, the Commissioner argues there was no conflict
7  with the *DOT* that required resolution.

8      Phillips argues the conflict is present in the *DOT*'s
9  definition of "reaching," which includes "extending the hands or
10 arms in *any* direction."  Dkt. #17, p. 3 (emphasis added; citation
11 omitted).  He argues the ALJ erred in failing to clarify with the
12 VE whether the identified jobs would involve, specifically,
13 overhead reaching.  Dkt. #17.

14     Were this the only error, the court would find it harmless.
15 Undoubtedly, the VE could identify jobs that require no overhead
16 reaching.  However, because the undersigned recommends remand for
17 further proceedings on other grounds, and, as discussed above,
18 further vocational testimony will be required upon remand, the
19 court also recommends the ALJ clarify that any jobs identified by
20 the VE do not require more than occasional overhead reaching.

21

22                    ***VI.  CONCLUSION***

23     Upon review of a final decision of the Commissioner, the court
24 may enter "a judgment affirming, modifying, or reversing the
25 decision, . . . with or without remanding the cause" for further
26 proceedings.  42 U.S.C. § 405(g).  Here, the court finds remand is
27 appropriate to obtain further vocational testimony regarding how
28

Phillips's mental limitations will affect his ability to work, and to clarify the reaching requirements of jobs identified by the VE.

### VII.   SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge. Objections, if any, are due by **December 19, 2014.** If no objections are filed, then the Findings and Recommendations will go under advisement on that date. If objections are filed, then any response is due by **January 6, 2015.** By the earlier of the response due date or the date a response is filed, the Findings and Recommendations will go under advisement.

IT IS SO ORDERED.

Dated this 1st day of December, 2014.


/s/ Dennis James Hubel
Dennis James Hubel
Unites States Magistrate Judge

46 - FINDINGS & RECOMMENDATION